## AS TO APPEAL TO THE COURTS IN CASE OF DISCHARGE OF A CIVIL SERVICE EMPLOYEE.

Superior Court of Cincinnati.

STATE OF OHIO, ON THE RELATION OF DANIEL B. LEROY, v. PHILIP FOSDICK, DIRECTOR OF PUBLIC SERVICE, AND WILLIAM LEIMANN, AUDITOR OF THE CITY OF CINCINNATI.

Decided, May 25, 1914.

*Civil Service—When Mandamus Lies to Restore a Discharged Employee —Whether Good Faith Was Shown in Investigating the Case and Making the Discharge is the Only Question Which May be Inquired Into.*

An employee of the city, in the classified civil service, was removed from his position by the director of public service, who furnished him with a copy of the order of discharge as required by the provisions of Section 17 of the civil service act, wherein was stated a legal and sufficient reason for discharge, but the discharged employee brought an action in mandamus wherein he prayed to

be restored to his former position, alleging that he had been discharged for political reasons in violation of the provisions of the aforesaid section of said act. *Held:*

1. The court has no power to reinstate the relator on the ground that the reason assigned for his discharge was untrue or that it had no existence.

2. If, however, it appear clearly from the evidence that the reason assigned for the discharge was untrue or had no existence, and that the said director knew this but nevertheless employed it as a sham or cover for a discharge under the form of law, when as matter of fact the sole reason for the discharge was political as alleged, then, in the absence of any showing that the relator is otherwise ineligible, the court will issue a writ of mandamus to said director commanding him to reinstate the relator in the position from which he was so unlawfully removed.

3. If it appear that the director, in making the removal for the reason stated, acted in good faith, the court can not order the reinstatement of the relator, even though it further appear that the said director was mistaken as to the truth or the existence of the reasons assigned for the removal.

4. For the purpose of determining whether or not the director acted in good faith, and for that purpose only, the court may hear such testimony as is offered bearing on the truth or falsity of the reasons assigned for the removal.

5. The writ of mandamus can issue to a public officer only where a clear, legal right in favor of the relator and a plain dereliction of duty on the part of the officer have been established.

*Alfred Bettman,* for relator.

*Charles A. Groom,* Assistant City Solicitor, contra.

PUGH, J.

Daniel B. LeRoy, a fireman at the city hall, Cincinnati, and an employee in the classified service under the civil service act, was discharged from his position on April 13th, 1914, and brings this action wherein he prays that he be restored to his former employment by writ of mandamus issued to the director of public service, Philip Fosdick, a defendant in this case. He claims that he was discharged arbitrarily and for political reasons and that, under the provisions of the civil service law, his discharge was unlawful and void.

This claim of the relator is denied by the defendant, the said director of public service, and a further defense of disrespect and

insubordination is set up in the answer, but as will subsequently appear it is unnecessary for the purpose of this decision to consider this second defense. The claim stated in the petition against the second defendant, William Leimann, the city auditor, being wholly dependent upon the disposition of the cause of action against the first defendant, requires no special separate consideration at present.

It appears from the testimony that the relator, Daniel B. LeRoy, was at the times hereinafter mentioned and still is a Republican in politics, but that he was appointed, in February, 1913, to the position of fireman by a Democrat, the then director of public service, by being selected from an eligible list, based upon competitive examination and furnished said director on his requisition therefor, by the municipal civil service commission. It is admitted that, since the relator's aforesaid appointment there has been a change of administration and that the present director of public service is a Republican.

The provisions of the civil service act relating to the removal of employees in the classified civil service are contained in Section 17, as follows:

"No person shall be discharged from the classified service, reduced in pay or position, laid off, suspended or otherwise discriminated against by the appointing officer for religious or political reasons. In all cases of discharge, lay off, reduction or suspension of a subordinate, whether appointed for a definite term or otherwise, the appointing officer shall furnish the subordinate discharged, laid off, reduced or suspended with a copy of the order of discharge, lay off, reduction or suspension, and his reasons for the same, and give such subordinate a reasonable time in which to make and file an explanation. Such order together with the explanation, if any, of the subordinate shall be filed with the commission."

In compliance with the requirements of the above section, a copy of the order of discharge was furnished the relator and the reason assigned therein for his removal was stated as "sleeping while on duty." No complaint is made that any of the statutory formalities were omitted nor that he was not given a reasonable time within which to file an explanation. Indeed, it is in evidence that the relator did file an explanation in the

form of a letter to the director in which he denied the accusation made in the order of discharge and refused to recognize the validity of his removal. It is conceded that the reason is stated in the order of discharge with sufficient definiteness and certainty and, if true, is an adequate reason for removal. The sole controversy in the case arises upon the relator's assertion that the reason assigned in the order of discharge was untrue as matter of fact and a mere sham and that the true reason for his discharge was political.

It is well settled by the decisions of other states whose civil service acts contain provisions like those of Section 17 above quoted, that in an action wherein a discharged employee seeks to be reinstated in his former position on the ground that he was unlawfully discharged, the court has no power to try the question, whether or not as matter of fact the reasons given for the removal were true. Upon consideration of these cases, it will be found that the rule of law upon the subject is that the court must determine from the circumstances whether the reasons stated for the removal were alleged in good faith or were merely a sham or cover for the removal, under formality of law, of an employee whom it was desired to get rid of for religious or political reasons. Further than this the court can not inquire.

In some states, it is required that before an employee in the classified list can be removed, he shall be furnished with written charges and be tried upon them before some board, tribunal, or officer, very much like the present law of this state in reference to employees in the fire and police departments (General Code, Section 4505). In other jurisdictions, the discharged employee is entitled to a written statement of the reasons for his removal and is granted the right to explain or justify himself in a written answer, as provided in Section 17 of the Ohio statute above quoted, but is accorded no right of trial. The rule as stated, however, applies in all cases, namely that, in the absence of statutory provision for an appeal or review of such charges by the court, the latter, when applied to for reinstatement by a discharged employee who claims that he was illegally removed, is limited in its inquiry to the question whether the charges

were made in good faith and have such relation to the office or position as, if true, to be ground for removal.

In construing a statute which bestowed upon a mayor the power of removal "for such cause as he shall deem sufficient," the Supreme Court of Massachusetts in the case of *Ayers* v. *Hatch,* 175 Mass., 489, used this language:

"The fact, however, that removals are to be for cause, repels the idea of removals at pleasure, even though the sufficiency of the cause is for him to decide. The question then arises, what jurisdiction has this court in regard to removals? The answer it seems to us is this. Cause implies, we think, a reasonable ground for removal, and not a frivolous or wholly unsatisfactory or incompetent ground of removal. If the cause assigned is a reasonable one, then whether under the circumstances it is sufficient to justify a removal, is for the mayor to decide and his decision is final. But whether the cause assigned constitutes, of itself, as matter of law, ground for removal, is a question for the court to determine."

A like view of the court's jurisdiction under a civil service statute which contained provisions similar to those prescribed by Section 17 of the Ohio act, was taken in New York, where the court in *People, ex rel Walsh,* v. *Brady,* 62 N. Y. Supp., 603, made the following statement:

"When charges have a real basis or foundation, are made in good faith and not as a mere pretext for removal, and they are of a substantial nature, showing some neglect of duty on the part of the officer, or something which materially affects his official acts, or his standing and character, and the officer is given an opportunity to explain away the charge, which explanation is received and acted upon in good faith, then the sufficiency of the proof and the propriety of the removal under the statute, rest entirely with the removing officer."

In *People, ex rel Fonda,* v. *Morton,* 148 N. Y., 156, an employee was removed by the Governor of the state, acting under a constitutional provision which authorized such removals for "incompetency and conduct inconsistent with the position," there being no other limitation on the power of removal than is implied by the above language itself, and O'Brien, J., in passing on the legality of the removal, said:

"The court can inquire with reference to a single question only and that is jurisdiction; but the power to inquire as to jurisdiction necessarily implies the right to examine into the nature and character of the charge in order to see whether it is in any proper sense a charge at all within the meaning of the Constitution."

Other New York decisions are to the same effect, see *People, ex rel Mitchell,* v. *La Grange et al,* 37 N. Y. Supp., 991; 2 N. Y. App. Div., 299; *People, ex rel Keech,* v. *Thompson,* 94 N. Y., 451; *Matter of Guden,* 171 N. Y., 529.

The civil service act of Wisconsin contains a provision which authorizes removal for "just cause" which is not "religious or political" and the Supreme Court of that state has held, in *State, ex rel Wagner,* v. *Dahl,* 140 Wis., 301, that what constitutes a "just cause" is matter of law for the court to determine, citing, at page 304, a number of authorities to that effect, but in Syl. 4, page 302, the extent of the court's jurisdiction to review the action of the discharging officer is thus limited:

"When the cause assigned is a "just cause" within the meaning of the statute, and there is nothing to show that he acted arbitrarily or in bad faith, a court will not review his decision as to the fact of the existence of such cause."

To the same effect is the case of *State, ex rel Bannen,* v. *Rose,* 140 Wis., 360.

In a later case, *State, ex rel Bannen,* v. *Arnold,* 151 Wis., 38, 40, it was held that the test of the legality of the discharge was whether the officer ordering it had acted in good faith and that the presumption of the law was in favor of his having done so. Hence, no relief could be afforded a discharged employee, even though it appeared that his removal had been made under mistake of fact.

The decisions above referred to are nothing more than the application to specific cases of the general principle which is thus stated by the Supreme Court of Ohio, in *State, ex rel Insurance Co.,* v. *Moore,* 42 Ohio St., 103:

*Syl. 2.* "When a public officer is called upon to perform a plain and specific public duty positively required by law, ministerial in its nature, calling for the use of no discretion, nor

the exercise of official judgment, his performance of such duty may, upon his refusal and in the absence of other means of relief, be enforced by mandamus.''

3. ''When such officer, in determining upon the performance of a public duty, is called upon to use official judgment and discretion, his exercise of them, in the absence of fraud, bad faith, and abuse of discretion, will not be controlled or directed by mandamus.''

The director of public service, in this instance, was called upon to determine whether he would retain or discharge the relator under the circumstances shown by the testimony in this case. Whether he decided to do the one thing or the other, necessarily he had to exercise his official judgment upon the conflicting statements of the witnesses. If this court interferes and sets aside his conclusion, it would amount to a substitution of the court's judgment and discretion for that of the director.

Although some courts state the rule in broader terms than others, there is a substantial agreement to the effect that where the power of removal of subordinates for cause, but without trial, is conferred upon an officer, the presumption of law is, in each particular instance, that he has acted in good faith, and that, in the absence of statutory provision, a court has no power to inquire into the truth of the causes assigned by him for any such removal or discharge further than to determine from the evidence in each particular case whether he acted in good faith or whether the removal was arbitrary, without any reasonable foundation whatever or whether made for political or religious reasons. To quote from one of the cases above cited (*State, ex rel Bannen,* v. *Arnold,* 151 Wis., 39, 40):

''If such were not the case, then, every time an appointing authority under the civil service law acts under the correlative power to discharge or remove he would do so in peril of having to justify his action in judicial proceedings by showing satisfactorily to some court of general jurisdiction, within his judicial district, that the cause assigned exists and is sufficient.''

In order to determine whether the reasons assigned were genuine, *bona fide* causes for removal or whether the removal was arbitrary or made for religious or political reasons, it is ob-

vious that the court, in many cases, must take into consideration what evidence there was before the removing officer and the extent to which it influenced his action. If the reasons assigned had no existence whatever and there was nothing whatever to induce a reasonable man to believe in their existence and this were coupled with the circumstances that the superior officer was a member of a different political party from that to which the discharged employee belonged and was eager and anxious to get his subordinates out of the way to make room for his own political associates, the court would have advanced materially toward a resolution of the question before it. For such purpose, but for no other, testimony as to the truth or falsity of the reasons set out in the order of discharge may be relevant, and for such purpose has been admitted in the trial of the case we are now considering.

Coming now to the consideration of the evidence solely with a view to the determination of whether the charges were made in good faith and really had any foundation or whether they were a sham, we find that the defendant, Philip Fosdick, director of public service, knew nothing whatever of these charges except what he was told by Eyrich, superintendent of public buildings, his subordinate. The charge was really made by Eyrich, upon circumstances alleged by him to have come within his personal experience. The director took the word of Eyrich without question and acted upon it by discharging the relator after receipt of the latter's letter of explanation, without further consideration of the subject. Under these circumstances, in making the present inquiry, it is but fair and reasonable to impute to the director any political or improper motives which are shown by the testimony to have influenced Eyrich in this matter. If these matters are not dealt with in this way a superior officer, who chose to repose implicit confidence in an untrustworthy subordinate, could remove any or all the employees in the classified service upon the recommendation of such subordinate and, when his reasons were challeneged in a proceeding like this, could shelter himself and, what is far worse, render effective such discharges upon the plea of his own personal good

faith. We must deal with this case as if Eyrich were himself the removing officer; his superior having practically turned over his authority to his lieutenant in this transaction and adopted and ratified what the latter saw fit to do.

The testimony itself is very simple. Eyrich alleges that on April 10th, 1894, he found the relator asleep at his post in the engine-room of the city hall while on duty, and at once reported the fact to the chief engineer and sent him to see the state of affairs for himself. The chief engineer, Mesch, says that Eyrich reported that the relator was asleep and requested him to go and waken him, and that he went into the engine-room and found the relator sitting in a chair, with his head slightly bent forward like a man who was "thinking" and that upon being spoken to, Le Roy got up on his feet as anyone else would have done. Mesch testifies that he was not able to determine whether the relator was asleep or not. The relator, Le Roy, says he was not asleep. He did not see Eyrich at all, but remembers the chief engineer speaking to him. This is all the testimony there was on the subject.

The claim is made that Eyrich's conduct, as he describes it, was unnatural, that anyone, under the circumstances, would have spoken to and awakened the sleeping man—if he had really been asleep, and that his account of the circumstances is therefore suspicious and reflects discredit upon his testimony. The inference thus attempted to be drawn from Eyrich's conduct under the circumstances is hardly justifiable. It was quite natural that, instead of awakening the relator, Eyrich should have wished the chief engineer, the relator's superior, to see for himself that his subordinate was sleeping on duty, and his conduct, upon this supposition, is what would have been expected. If the story of the fireman being asleep was a fabrication of Eyrich's, why should he send the engineer to see for himself? If the relator had been awake, it was at least probable that the chief engineer would have seen it, and Eyrich would thereby have furnished the relator with a witness whose testimony would have betrayed his fabrication. It was mere chance that Le Roy was in such a position that it could not be seen at once whether he was asleep or awake.

The relator testified that he was served with the order of his discharge by Eyrich and that, in the conversation that ensued, the latter said, "they" or "the boys are after your job, you ought to be more careful." This, however, is denied by Eyrich and the allegation can not be said to be proved.

In addition, it will be observed that the remark, assuming it was made, is perfectly consistent with Eyrich's claim that the relator was asleep while on duty.

The complaint that the explanation of Le Roy in answer to the charge against him was not received and considered by the director in good faith, that he paid no further attention and made no further inquiry or investigation is not of much force under the circumstances. There were but two possible witnesses, Eyrich, the accuser, and Le Roy, the accused, Mesch, the chief engineer, being wholly unsatisfactory and disclaiming any knowledge whatever on the only point in controversy. In his testimony, the director said truly that it was a case of one witness against another, and that he chose to believe Eyrich whom he knew rather than Le Roy whom he did not. There really was nothing more he could do under the circumstances. No inquiry or investigation could throw any more light on the subject, and, as matter of fact, after the investigation of counsel the hearing of all the witnesses and the trial of the case on its merits, neither court nor counsel have learned anything more on the subject than was known to Fosdick when he first read Le Roy's letter of explanation.

Taken all together, this testimony is inconclusive. If submitted to a fair and intelligent jury, no one could foretell the verdict; indeed, it is quite likely that such a jury would fail to agree.

The writ of mandamus can issue to a public officer only where a clear legal right in favor of the relator and a plain dereliction of duty on the part of the officer have been established (*State, ex rel J. R. Mills & Co.,* v. *County Commissioners,* 20 Ohio St., 425, 430; *Ex parte Black,* 1 Ohio St., 30; *State* v. *Smith,* 71 Ohio St., 13, 38), and neither of these prerequisites are proved where the testimony is conflicting and doubtful as in this case.

Under these circumstances, it is not possible for the court to find from the testimony that the reason given for the relator's removal in the order served upon him was a sham and that there was no foundation whatever for the charge. Still less is it possible to find that the sole motive for the relator's discharge was political. It may be that, despite the fact that he has testified he was a Republican in politics, it was desired to get rid of Le Roy in order to put some one in his place for political reasons. Even so the case would fall within the intendment of the ruling in *State, ex rel Stephen Menner, v. Holmes,* decided recently by this court but not reported, namely, that where the circumstances are such that the discharge is legal on the grounds assigned in the order of discharge, it does not become unlawful because of the fact, if such it be, that the officer ordering the removal desired in addition to get rid of the relator for political reasons.

For the reasons stated the application for a writ of mandamus directed to the defendant, Philip Fosdick, director of public service, will be denied and the case against him be dismissed. As the claim in the petition against the second defendant, William Leimann, the city auditor, is dependent upon the writ of mandamus being issued to the first defendant, the relief prayed for as to him will also be denied and the case as to him be dismissed likewise.